1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2

3    Civil Action No. 07-cv-02235-MSK-KMT

4    DONALD N. TARANTO,

         Plaintiff,
5

6    vs.

7    UNITED STATES OF AMERICA,

         Defendant.
8    _____

9    UNITED STATES OF AMERICA,

10        Counterclaim Plaintiff,

11   vs.

12   DAVID MASKELL,

13        Counterclaim Defendant.

14   _____

15

16                     **REPORTER'S TRANSCRIPT**
                    (Final Pretrial Conference)

17   _____

18          Proceedings before the HONORABLE MARCIA S. KRIEGER,

19   Judge, United States District Court for the District of

20   Colorado, commencing at 10:07 a.m., on the 25th day of

21   February, 2009, in Courtroom A901, United States Courthouse,

22   Denver, Colorado.

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
        Produced via Computer by Paul Zuckerman, 901 19th Street,
25        Room A259, Denver, Colorado, 80294, (303) 629-9285

| | |
|---|---|
| 1 | **APPEARANCES** |
| 2 | AARON M. BAILEY and JAMES E. WEAVER, Trial Attorneys, |
| 3 | U.S. Department of Justice, Tax Division, P.O. Box 683, Ben |
| 4 | Franklin Station, Washington, D.C., 20044, appearing for the |
| 5 | Counterclaim Plaintiff United States. |
| 6 | KEVIN A. PLANEGGER, Attorney at Law, Merriam Law Firm, |
| 7 | P.C., 1625 Broadway, Suite 770, Denver, Colorado, 80202, |
| 8 | appearing for the Counterclaim Defendant Maskell. |
| 9 | *   *   *   *   * |
| 10 | **PROCEEDINGS** |
| 11 | (In open court at 10:07 a.m.) |
| 12 | *THE COURT:*  Please be seated. |
| 13 | The Court is convened in Case No. 07-cv-2235.  This is |
| 14 | encaptioned for purposes of a trial as the United States of |
| 15 | America vs. David Maskell.  The matter is set down for a final |
| 16 | pretrial conference. |
| 17 | Can I have entries of appearance, please. |
| 18 | *MR. BAILEY:*  Aaron Bailey on behalf of the United |
| 19 | States. |
| 20 | *MR. WEAVER:*  James Weaver on behalf of the United |
| 21 | States. |
| 22 | *THE COURT:*  Good morning and welcome. |
| 23 | *MR. PLANEGGER:*  Kevin Planegger on behalf of David |
| 24 | Maskell. |
| 25 | *THE COURT:*  And do we have anybody by phone? |

1          *MR. WARD:*  Yes, your Honor.  Richard Ward on behalf of

2     the United States.

3          *THE COURT:*  Thank you.  Welcome to you as well.

4          *MR. WARD:*  Thank you, your Honor.

5          *THE COURT:*  And where is Mr. Maskell?

6          *MR. PLANEGGER:*  Your Honor, he is in Georgia, where he

7     resides.  I filed a late motion to have him appear

8     telephonically.  That hasn't been ruled on.

9          Mr. Maskell has severe financial constraints that have

10    just been -- I've just been kind of made aware of very

11    recently, within the last couple weeks; and he just -- he's not

12    able to be here.

13         *THE COURT:*  Well, your motion wasn't ruled on; and

14    therefore, he was obligated to be here.

15         *MR. PLANEGGER:*  I understand that, your Honor.

16         *THE COURT:*  In these circumstances, I would ordinarily

17    suggest that we hook him in by telephone; but because we

18    already have someone else hooked in by telephone and we only

19    have one line coming into the courtroom, that's not an option.

20    As a consequence, I'm going to direct you to obtain a

21    transcript at your expense, not your client's expense --

22         *MR. PLANEGGER:*  Okay.

23         *THE COURT:*  -- of this proceeding.  And it will be

24    prepared on an expedited basis because this matter will be

25    going to trial and I want your client to have an opportunity to

1   review the transcript.  Part of the reason we have clients here

2   is because this is not like what happens in front of a

3   magistrate judge.  This is not a *pro forma* hearing.  The

4   purpose of this final pretrial conference is twofold: one, to

5   get the matter ready for trial, which is what concerns the

6   attorneys and the Court; but the second is to raise the

7   awareness of the parties as to what the trial process entails.

8   And it's of particular concern to this court, given financial

9   constraints that your client may suffer from, that he have

10  reasonable expectations as to what this process is going to

11  entail.  Only if he has a good appreciation of that -- and I'm

12  sure you've explained it to him, but sometimes it helps if it

13  comes from me -- can he make well-founded decisions as to what

14  he wants to do.  So his absence here really impairs the

15  process.

16          *MR. PLANEGGER:*  I understand, your Honor.

17          *THE COURT:*  Please make arrangements with

18  Mr. Zuckerman at the close of the hearing, and we'll get that

19  transcript to you.

20          *MR. PLANEGGER:*  That will be done.

21          *THE COURT:*  Thank you.

22          As I said, the final pretrial conference in civil

23  cases such as this has two purposes.  One is to get the matter

24  ready for trial and to make sure that it is, indeed, ready for

25  trial and to set the trial.  But in addition and probably even

1    more important than that process is to make sure that the

2    parties have a clear understanding of what the trial process is

3    about, what it can accomplish, what it can't accomplish.

4         And it's been my experience that part of the reason

5    that we need to do that is there is a certain folklore about

6    trials that comes from watching "Law and Order," reading novels

7    and whatnot; and what happens in the press and in fiction and

8    in TV and the movies is vastly different than what happens in a

9    real courtroom.  And therefore, it is my belief that we need to

10   go over that for the parties so that they have realistic

11   expectations as to the trial process.

12        I've had an opportunity to look at your final pretrial

13   order, and it looks like it takes care of most of the issues

14   that we need to address; however, I'm somewhat confused in

15   light of the stipulations of fact, particularly paragraphs 1,

16   2, 3, 4, in those stipulations, why there has to be evidence

17   presented as to the payroll liabilities of the company or the

18   penalty assessments.

19        *MR. BAILEY:*  Well, your Honor, if I can address that

20   just briefly, I believe that goes to the underlying liability.

21   And the reason that Mr. Maskell is here today is because of the

22   unpaid payroll obligations of this company, and that's why we

23   felt it was something we agreed on as to stipulation.  It's

24   truly not a matter to be tried, but it is an underlying

25   predicate of his liability.

1          *THE COURT:*  I'm not following you.

2          *MR. BAILEY:*  Okay.

3          *THE COURT:*  I look at your stipulated facts.  You have

4   that the parties are stipulating as to the trust fund portion

5   of the taxes for the representative time periods.  Am I missing

6   something?

7          *MR. BAILEY:*  I think the distinction is whether there

8   was an assessment made for these amounts vs. whether or not

9   they were accurate or whether or not -- With regard

10  specifically to Mr. Maskell, whether or not he is liable for

11  those amounts is a different matter than whether or not they

12  were assessed by IRS.

13         *THE COURT:*  Precisely.  Is there a disagreement among

14  the parties that these assessments were made?

15         *MR. PLANEGGER:*  No, your Honor.

16         *THE COURT:*  Then why do you need evidence of it?

17         *MR. WEAVER:*  Your Honor, the only thing that is not in

18  these stipulations -- and if Mr. Planegger wants to stipulate

19  to it, then we can eliminate one or two of our witnesses, the

20  IRS witnesses -- is these stipulations do not include accruals.

21  And so we would have to further stipulate.  The $430,000 amount

22  that you see in Part 2 there is not adjusted for interest that

23  has accrued; or, for that matter, there is two parties in this

24  case who have settled out, and it has to be adjusted for that

25  as well.  So we can a draft a stipulation that takes care of

1    that, but it was our intent to bring in an IRS person to say --

2         THE COURT:  All right.  Let me see if I can be clear,

3    because maybe I'm not communicating real well here.  You have

4    stated that you intend to present evidence that Firewall

5    Forward Aircraft Engines Inc. operated an aircraft engine

6    overhaul business in the Fort Collins/Loveland airport between

7    1984 and 2004.  Why do have you to present evidence as to that?

8    Isn't that a stipulated fact?

9         MR. WEAVER:  Your Honor, there is a -- something that

10   isn't -- I think we worked at stipulating to that didn't get

11   stipulated to, and that was the overlap or identity between a

12   couple of companies, the assessed company Firewall Forward

13   Aircraft Engines Inc. and a company that essentially really

14   never got going, but there were checks running through an

15   account --

16        THE COURT:  I think you're making this more

17   complicated than it needs to be.  Let's see if there is any

18   disagreement.  Does the defendant stipulate that Firewall

19   Forward Aircraft Engines Inc. doing business as Firewall

20   Forward Inc., a Colorado corporation, operated an aircraft

21   engine overhaul business in the Fort Collins/Loveland airport

22   between 1984 and 2004?

23        MR. PLANEGGER:  No, your Honor.  I think there is --

24   Sometime between 2002 and 2004, Firewall Forward Aircraft

25   Engines Inc. ceased doing business or somehow transferred into

1    Firewall Forward International.

2              THE COURT:  All right.  Then you stipulate to this as

3    between 1984 and some particular date; is that correct?

4              MR. PLANEGGER:  Certainly.

5              THE COURT:  What's the particular date?

6              MR. PLANEGGER:  I think that's unclear but certainly

7    like through the end of 2001.

8              THE COURT:  Okay.  So it's at least 1984 through 2001.

9              MR. BAILEY:  Well, your Honor, we don't agree to that,

10   because part of the issue here -- there could be an issue as to

11   whether or not the correct company was assessed -- and we don't

12   know that that's their argument or not -- but Firewall Forward

13   Aircraft Engines Inc. was not dissolved until 2004.

14             THE COURT:  Okay.  Let's stop for just a minute here,

15   because you're fighting about things you don't need to fight

16   about.  You have a stipulation that, indeed, Firewall Forward

17   aircraft engines Inc. operated as Firewall Forward Inc. from

18   1984 at least through 2001; so the issue then is whether it

19   operated that way after 2001.  Right?

20             MR. BAILEY:  I believe that's correct.

21             THE COURT:  Then you don't need to put on evidence at

22   trial as to how it operated between 1984 and 2001.  You're

23   going to be asking the jury to determine whether or not it

24   operated that way after 2001.

25             MR. WEAVER:  Your Honor, that is almost -- we're

1    almost in agreement with that; but some of the players who came

2    in, in 2000 and 2001 -- There was a change in the structure

3    that is material to whether that carried over.

4         THE COURT:  That's fine, and you put on evidence as to

5    that; but there is no reason, then, to put on evidence as to

6    its activities between 1984 and 2001.

7         MR. WEAVER:  Except to the extent in 2000 and 2001 as

8    it carries forward.

9         THE COURT:  Right.

10        MR. WEAVER:  Yes, your Honor.

11        THE COURT:  So you can amend this to delete a lot of

12    the evidence that you think you were going to present.

13        MR. BAILEY:  Well, actually, your Honor, I don't

14    believe, other than the testimony of Mark Seader, which is

15    simply background testimony --

16        THE COURT:  We're not having background testimony.

17    That's the point.

18        MR. BAILEY:  Okay.  Understood.  Well, Mark Seader

19    formed the company in 1984.  It was incorporated in 1984.  That

20    would probably be the extent of our pre 2000 — 2001 evidence.

21    There is no -- in the exhibits, you would not see checks,

22    financial reports, and so forth, prior to the 2001 period.

23        THE COURT:  All right.  What is David Maskell going to

24    testify with regard to this?  You've listed him as a witness.

25        MR. BAILEY:  Yes.  I believe that Mr. Maskell has

1  knowledge of the Firewall Forward Aircraft Engines Inc.

2  business prior to 2002, what its operations were, what kind of

3  business it carried on.

4       THE COURT:  Is that going to be duplicative of what

5  Mr. Seader is going to testify to?

6       MR. BAILEY:  Not necessarily, your Honor.

7       THE COURT:  Well, it better not be.

8       This is my point:  We need now to focus on what is at

9  issue, and you need to have the witnesses designated for that

10 which is at issue.  I'm not inclined to set this for a six-day

11 jury trial if, indeed, it does not require six days to present

12 evidence on the disputed issues and you're not going to be

13 putting on evidence as to the issues that are not in dispute,

14 because you'll have a stipulated list of facts that will go to

15 the jury and they will have those facts established.

16 Therefore, no evidence as to those needs to be presented.

17      So what I'm trying to find out here is you've got a

18 very broad statement pertaining to the time period 1984 to

19 2004.  It seems to me you don't have an issue as to 1984 to

20 sometime in 2001.  So you're concerning yourself with the time

21 period sometime in 2001 forward.

22      MR. BAILEY:  Yes.  That's correct.

23      THE COURT:  And you're going to have Mark Seader

24 testify as to that.

25      MR. BAILEY:  Yes.

1        THE COURT:  You're going to have David Maskell testify

2   as to that but not duplicating Mr. Seader; right?

3        MR. BAILEY:  That's our intent.

4        THE COURT:  Okay.  Then what is Kurt Hoeven and Pat

5   Korb going to say about?

6        MR. BAILEY:  Kurt Hoeven has information about the

7   financial planning of that organization that Mr. Seader was not

8   privy to, it's our understanding, and that Mr. Maskell has told

9   us he also was not privy to, although there is conflicting

10  testimony there.

11       THE COURT:  Okay.  And it's going to concern something

12  2001 forward?

13       MR. BAILEY:  That is correct, your Honor.

14       THE COURT:  Okay.  And how is Pat Korb going to be

15  able to testify to this?  She's an agent.

16       MR. BAILEY:  She is an agent, and she could testify to

17  the investigation of this particular company and why it was

18  being investigated.

19       THE COURT:  And how is that going to have to do with

20  whether or not this company operated under these names 2001

21  forward?

22       MR. BAILEY:  Because she has knowledge that that

23  company held itself out to be doing business under those names

24  in that time period.  That is important, we believe, in this

25  case.  But, your Honor, if we can at all avoid duplicative

1    testimony, we certainly will make an effort to do so.

2         *MR. WEAVER:*  Your Honor, we've thought about this.  We

3    were pretty conservative in the timing of how each of the

4    witnesses were going to be allocated.  We've talked about it

5    amongst ourselves, the Government's side has; and we are pretty

6    confident we can present our case in a day and a half to two

7    days, starting Tuesday morning --

8         *THE COURT:*  All right.  Even if you are, we're not

9    going to have extra evidence here.

10        *MR. WEAVER:*  Well, let me elaborate.  Hoeven and Pabst

11   are specifically here because they, we believe, are going to

12   testify about one of the elements in this case that is at

13   issue, willfulness, and, in fact, what Mr. Maskell's role was

14   in deciding what creditors to pay and, in fact, making

15   instructions about who not to pay, namely the United States,

16   during both -- 2002, when they were there.  I think they both

17   left at the end of 2002, roughly.  But also some of that bleeds

18   backwards into 2001.

19        Mr. Seader will be testifying as to also Mr. Maskell's

20   responsibility during that time period.

21        Mr. Maskell is going to be called very briefly -- not

22   extended time, but there are certain things that he can

23   authenticate, confirm or deny about related businesses that the

24   business at issue was funding or receiving funds from.  And so

25   we think there is going to reason for everyone that's on here.

1           The only one -- Ms. Korb may be expendable.  I'm not

2    sure that we need her.  And if, in fact, we don't have to prove

3    up any of the IRS numbers at all, they're all going to be

4    stipulated to --

5           THE COURT:  Then why are we having exhibits of all

6    that?

7           MR. WEAVER:  We can eliminate -- I think there is four

8    five exhibits that we can eliminate if everything is stipulated

9    to numbers-wise.

10          THE COURT:  Well, let's go through the elements that

11   you have to prove and find out whether or not we have

12   stipulations here.

13          The second contention you have here is that "Firewall

14   Forward Inc. failed to pay federal payroll taxes from April,

15   2002, through September, 2003."  Is that in dispute?

16          MR. PLANEGGER:  No, your Honor.

17          THE COURT:  All right.  Then there is no evidence that

18   needs to be presented to that.  You can add that to your list

19   of stipulated facts.

20          MR. BAILEY:  Okay.

21          THE COURT:  Let's go to the next one:  "During the tax

22   periods at issue, Firewall Forward Inc. and Firewall Forward

23   International L.L.C. operated as an indistinguishable entity

24   carrying on the engine overhaul business."  That's in dispute,

25   I understand.

1          MR. PLANEGGER:  Yes, your Honor.

2          THE COURT:  Okay.  Is it disputed that Firewall

3     Forward International L.L.C. had no employees?

4          MR. PLANEGGER:  No, your Honor.

5          THE COURT:  Okay.  You don't need to put on evidence

6     as to that.  You can add that to your stipulated facts.

7          "For all purposes relevant to this litigation,

8     Firewall Forward Inc. and Firewall Forward International L.L.C.

9     operated as the same company under the name of Firewall

10    Forward."  That seems to me to be the same issue that's in

11    dispute; is that correct?

12         MR. PLANEGGER:  Yes, your Honor.

13         THE COURT:  Okay.  And then "To the degree that

14    Firewall Forward International L.L.C. was identified as a

15    separate entity, it and/or its agents, including David Maskell,

16    controlled and directed the employees and finances of Firewall

17    Forward Inc.  Mr. Maskell and entities were associated with

18    Mr. Maskell . . . ."  This is all the same evidence that's

19    going to be presented with regard to responsibility; correct?

20         MR. BAILEY:  Correct.

21         THE COURT:  And that's in dispute.

22         MR. PLANEGGER:  Yes, your Honor.

23         MR. WEAVER:  Your Honor, before we go on, there is one

24    other fact if we can stipulate to might eliminate Mr. Ulmer,

25    and that is if Mr. Maskell's counsel is willing to stipulate

1  that Firewall Forward International never filed any employment

2  tax returns in addition to not having any employees.

3        MR. PLANEGGER:  I'll stipulate to that during those

4  time periods.  I don't know about post-2004 but --

5        MR. WEAVER:  With respect to the tax periods at issue.

6        MR. PLANEGGER:  Okay.  Yes.

7        THE COURT:  Okay.  Now, as to the penalty assessments,

8  is there any dispute that the penalty assessments were made?

9        MR. BAILEY:  Certainly not from our end, your Honor.

10       MR. PLANEGGER:  No, they were definitely made, your

11  Honor.

12       THE COURT:  I think that's why we're here.  Okay.

13  Then you can stipulate that these assessments were made.  You

14  can stipulate to the amount of assessments.

15       MR. BAILEY:  Your Honor, I believe we have.  It may be

16  partially our misunderstanding of the requirement to set forth

17  the claims and defenses, but we believed that we should set

18  forth what we would have to prove at trial.

19       THE COURT:  That's not the purpose of this.

20       MR. BAILEY:  Okay.  I apologize, your Honor, because I

21  think all counsel thought that that was --

22       THE COURT:  The purpose here is to narrow this so that

23  we know what has to be tried.

24       MR. BAILEY:  Understood.

25       THE COURT:  That's why you are supposed to list the

1    witnesses and the exhibits to establish something, is so that

2    you're communicating with each other and you can say, "I

3    stipulate to that," because under Rule 11, you each have an

4    obligation to do that unless you have contrary evidence.

5              MR. BAILEY:  Understood.

6              THE COURT:  So it would seem to me that the penalty

7    assessment part you can stipulate to.  They were made and they

8    were made in this amount; correct?

9              MR. PLANEGGER:  Yes.

10             THE COURT:  Okay.  You've got lots of factual

11   stipulations.  That's what made me think that these be covered

12   by that, and I think your factual stipulations cover that

13   already.

14             MR. BAILEY:  They do, your Honor.

15             THE COURT:  Okay.  Now, with regard to responsibility,

16   is there a dispute that Mr. Maskell exercised substantial

17   control over the financial affairs of Firewall Forward?

18             MR. PLANEGGER:  There is, your Honor.

19             THE COURT:  Okay.  Is there a dispute that he was an

20   investor in the engine overhaul business of Firewall Forward?

21             MR. PLANEGGER:  There is no dispute.

22             THE COURT:  Okay.  You can add to that your list of

23   stipulated facts.

24             Is there a dispute that he was a signatory on the bank

25   accounts?

1          MR. PLANEGGER:  No, your Honor.

2          THE COURT:  That can go into the stipulations as well.

3          Is there a dispute that he signed checks on behalf of

4    Firewall Forward during the periods at issue, including checks

5    for the purpose of paying payroll taxes of the company?

6          MR. PLANEGGER:  The only thing I would state with

7    respect to that is I'm only aware of one check that he signed

8    for the purposes of paying payroll taxes of the company.

9          THE COURT:  Did he sign other checks?  Because this

10   covers both.

11         MR. PLANEGGER:  Not that I'm aware.

12         MR. WEAVER:  Your Honor, we have -- I don't know about

13   in terms of payroll checks, but we have a large volume of

14   checks that Mr. Maskell --

15         MR. PLANEGGER:  We don't dispute that there were

16   hundreds, if not thousands, but --

17         THE COURT:  All right.  Why don't you stipulate to

18   that; and if there is only one payroll check that you have that

19   he signed, then that's what the stipulation should say:  "And

20   he signed one payroll check."

21         MR. WEAVER:  Your Honor, with -- if we could -- we

22   would like to still put the checks in evidence.  I mean this is

23   a jury trial.  I would think that the jurors would like to see

24   not every check but a sampling of checks that Mr. Maskell

25   signed.

1     THE COURT:  And why would he be doing that if you

2  stipulate to that?

3     MR. WEAVER:  Well, because it's one thing to say you

4  stipulate to checks; it's another thing to look at a big stack

5  of checks.  But --

6     THE COURT:  So your theory is that the jury cannot

7  understand the fact from stating the fact; that you need to

8  somehow give them something physical to look at?

9     MR. WEAVER:  No, but I do think that one creates a

10  different impression than the stipulation itself.  So we would

11  like to still have the checks come in as evidence, even if it's

12  stipulated to.

13     THE COURT:  What's the position of the defendant?

14     MR. PLANEGGER:  I think if we're stipulating to the

15  checks -- I mean they don't need to see them.

16     MR. WEAVER:  We don't agree on that, your Honor.

17     THE COURT:  What is it that the jury is supposed to

18  get from that that they don't get from the stipulation?

19     MR. WEAVER:  Well, your Honor, because I don't know

20  how a jury may think on this; but, you know, a person may

21  think:  Well, he signed a few checks.  He made a mistake.

22  We're not going to find him liable."  On the other hand, if he

23  signed hundreds of checks and they're large checks and they're

24  payroll checks and other things and they're various time

25  periods, then the inference is -- that can be drawn from that

1   are many, including this guy was on the scene a lot, he knew

2   what he was doing.  And some of that comes through the

3   testimony.

4          But if you create a skeletal case in some respects and

5   go too far, it's hard for someone to get a real feel for how

6   often, what kinds -- you know, was there spending liability --

7   or spending limit that Mr. Maskell had.  Not that we're aware

8   of; but, you know, some of that evidence I think is helpful for

9   a juror to figure out what was going on.

10      *THE COURT:*  What I understand you to say is that the

11  issue here is not simply that he signed checks but it's the

12  amount of checks that he signed and the frequency with which he

13  signed checks or the number of checks that he signed over a

14  period of time; is that correct?

15      *MR. WEAVER:*  Yes.  The impression that's created by

16  the addition of the evidence about his overall level of

17  responsibility and, you know, that he was up to his elbows in

18  some of this.

19      *THE COURT:*  All right.  I am not convinced that the

20  checks themselves necessarily have to be presented to the jury.

21  You could just as easily accomplish that purpose by having a

22  listing of the checks as a summary exhibit or by having

23  testimony with regard to the kinds of checks he signed and how

24  frequently he signed them; but if you -- it's your case, and

25  you can present that aspect however you choose to do it.

1          *MR. WEAVER:*  Thank you, your Honor.

2          *THE COURT:*  I urge you in considering that -- and I

3     I'll point this out a little bit later -- to read juror

4     comments for the more than 80 jury trials we've had in this

5     courtroom and their repeated statement that they find most

6     civil jury trials to have way too many exhibits.  So please

7     think about that as you decide what it is you want to present

8     to the jury.  Their two greatest gripes -- and there are close

9     to 150 comments that you're free too look at.  Their two most

10    frequent complaints are that their time's wasted and their

11    intelligence is insulted.  And so if you can think of a way to

12    present your case, all the aspects of the significance of the

13    evidence, that is deferential to the jury, I urge you to do so.

14          Next issue here is that David Maskell signed a

15    Form 941 on behalf of Firewall Forward Aircraft Engines Inc.

16    Is there any dispute as to that?

17          *MR. PLANEGGER:*  No dispute.

18          *THE COURT:*  So you don't need Exhibit 2, do you?

19          *MR. BAILEY:*  Yes, your Honor, in fact we do.

20    Exhibit 2 is a crucial exhibit not only because Mr. Maskell

21    signed this tax form that was submitted to IRS, but on the face

22    of the form itself, it shows that there is an outstanding

23    balance due to IRS, which goes to his knowledge of the taxes

24    and which goes to willfulness, which is important.  I think it

25    would be prejudicial not to have that exhibit.

1          THE COURT:  All right.  You know, we can go through

2    every one of these paragraphs; but perhaps it would be more

3    helpful for you all to do that yourselves and figure out what

4    needs to be presented here.  And I'm hearing some good

5    arguments with regard to the significance of evidence, but not

6    everything that you have needs to be presented.  And so you

7    need to figure out what that is.

8          You have listed here 67 exhibits, but many of them are

9    multiple documents.  I have some question as to whether you

10   really need all these things.  You've stipulated to the

11   admission of all of these.  And please understand they will not

12   be received unless they're offered.  The mere fact that you

13   stipulated doesn't admit them into evidence.  But I would

14   really look through this stuff, because Rule 403 precludes that

15   evidence which is redundant and cumulative; and I'm not

16   inclined to bury the jury with paper.

17          MR. WEAVER:  Yes, your Honor.  We recognize that.  And

18   again, we were fairly conservative in putting this together.

19   Were we to go to trial tomorrow, not all of those exhibits

20   would be sought to be admitted; but we also don't know

21   precisely what someone is going to say in some of these

22   instances, and so they're in there in case we need them.

23          THE COURT:  Okay.  With regard to the counterclaims,

24   again you have some of the same issues.  You've designated

25   multiple witnesses for individual facts.  And I understand that

1    you're trying to make sure that you have told the other side

2    what witnesses you might call; but the truth of the matter is

3    you're not going to have repetitive witnesses saying the same

4    thing.  Choose your best witnesses to say what you have to say.

5            And that then takes us to your calculation of the

6    amount of time you think the trial is going to take.  You've

7    estimated 37 hours.  Doesn't look to me like a 37-hour trial;

8    but moreover and more importantly, 37 hours of the presentation

9    of testimony doesn't fit within a five-day trial, doesn't fit

10   within a six-day trial.  The amount of time available for

11   presentation of evidence in a five-day trial is roughly 20 to

12   21 hours, and that's because -- and that includes not only the

13   presentation of evidence but all of the objections that you

14   might make with regard to that evidence, and that's because

15   some part of the trial has to be devoted to the selection of

16   the jury and the charging of the jury and, of course, your

17   charging conference and opening statements and closing

18   arguments.

19           So thinking about this, how long do you really need

20   for a trial?

21           *MR. WEAVER:*  Your Honor, the United States is

22   confident that we can present our case in a day and a half at

23   the outside.  If there are witness problems and objections and,

24   you know, difficult examinations, two days at most of

25   testimony.  So assuming we started our case Tuesday morning, we

1   should be done at the latest by the end of Wednesday.

2            THE COURT:  All right.  What's the defense case look

3   like?

4            MR. PLANEGGER:  Your Honor, we're -- we were also

5   relatively conservative in terms of listing witnesses.

6            THE COURT:  Sure.

7            MR. PLANEGGER:  And I think at least two or three are

8   probably going to get dropped off.  I'm confident that we could

9   present our case also in a day and a half.

10           THE COURT:  Well, if I give you a five-day trial, it

11  will go to the jury on Friday.  It doesn't spill over to the

12  next week.  So is that going to be enough time for everybody?

13           MR. BAILEY:  I think so, your Honor.

14           MR. PLANEGGER:  I'm confident that's enough time, your

15  Honor.

16           THE COURT:  Okay.  Then what we'll do is I'll ask you

17  to revise your proposed final pretrial order to include the new

18  stipulated facts and to delete the proof that you don't need to

19  put on and to resubmit that.

20           When can you have that done?

21           MR. BAILEY:  Well, your Honor, we're going to be in

22  Colorado over the next day and a half, won't be back to the

23  office till the end of the week; but we could try to have

24  something by the end of the week or early next week, Monday or

25  Tuesday at the latest.

1        *THE COURT:*  Whatever time period that you all can work

2   with.

3        *MR. PLANEGGER:*  Well, I'll be around, you know, for

4   the next week, so I mean say a week from today?

5        *MR. BAILEY:*  Sure.  That's fine with us.

6        *THE COURT:*  Does that give you enough time, or do you

7   want ten days?

8        *MR. PLANEGGER:*  More time is always better, your

9   Honor.

10       *THE COURT:*  Well, I don't know about that.  More time

11  gives you more to think of.

12       We'll say March 6, which is a week from this Friday.

13  Does that work for everybody?

14       *MR. PLANEGGER:*  That's perfect, your Honor.

15       *MR. BAILEY:*  Yes, your Honor.

16       *THE COURT:*  Okay.  Then please refile an amended

17  proposed final pretrial order that makes the revisions that you

18  need to have to reflect your stipulations and then limits what

19  evidence it is that you need to present.  And you're free --

20  and I encourage you to do it with regard to the claims and

21  affirmative defenses -- to state with regard to certain aspects

22  that this is stipulated.

23       *MR. WEAVER:*  Your Honor, I gather we will also at that

24  time submit revised and hopefully shortened witness lists.

25       *THE COURT:*  That would be great, if you choose to make

1    changes there.

2            With regard to your exhibit list, you know, you may

3    just not offer some of this stuff.  And if that's the case, if

4    you want to handle it that way, you really don't need to submit

5    a new witness list -- I'm sorry -- a new exhibit list because

6    you just won't offer it.  The mere fact that you put it on an

7    exhibit list and you've stipulated to it is for your use; it's

8    not for ours.

9            MR. WEAVER:  We actually had a couple of edits anyway;

10   so if it's all right with the Court, we'll resubmit that.

11           THE COURT:  That sounds fine.

12           Now, as far as setting a trial, we can either --

13   looking at March 9 as the earliest date, or the next available

14   date would be October 19.

15           MR. BAILEY:  I don't believe March 9 would give us an

16   appropriate amount of time, your Honor; so I think we would

17   prefer. Glover October.

18           MR. PLANEGGER:  We had -- I would agree that

19   October 19 would work better.

20           THE COURT:  I apologize it's so long.  We have a

21   number of multiweek multidefendant criminal trials between now

22   and then, and criminal trials take precedence over all civil

23   trials.  And the only reason I have the March date available is

24   because, indeed, we had a trial that was scheduled for that

25   date that was settled.

```
1           We'll set this, then, for the October 19 date.  We'll
2    start at 1:00 p.m. on the 19th.  The case will go to the jury
3    at the end of that week on -- if not before, it would go to the
4    jury on the 23rd of October.
5           The way we work the courtroom usage during that week
6    is that you will have one-half of the amount of time, each
7    side.  You can figure 21 hours.  That includes -- actually we
8    need to make it 22 hours.  And that includes time for your
9    opening statement, your closing argument.  We don't regulate
10   how you use your time.  Ms. Glover will keep track of your time
11   on the chess clock.  You can ask her at any point along the way
12   how much time you've used, how much time you have left.
13          Any questions about that?
14          MR. BAILEY:  None, your Honor.
15          MR. PLANEGGER:  No, your Honor.
16          THE COURT:  Questions about the trial process that you
17   might have?
18          MR. BAILEY:  Your Honor, we do have one issue which
19   has come up.  We have one relatively crucial witness, Stephanie
20   Pabst, who lives out of the jurisdiction; and we understand
21   that you have procedures for remote testimony in certain
22   circumstances.  And so we were wondering about the
23   possibility -- and we're certainly contemplating the
24   possibility of filing a motion, and I guess we would like to
25   have the Court's input.
```

1          *THE COURT:*  I don't give advisory rulings on motions;

2    so if you'd like to file a motion, you're free to do so.

3          *MR. BAILEY:*  Understood.

4          *THE COURT:*  The provisions are set forth in the

5    practice standards.

6          *MR. BAILEY:*  Understood.

7          I believe that's it, your Honor.  We've exchanged

8    deposition designations.  If the Court would like us to file

9    those --

10         *THE COURT:*  No, and I don't review them.  If you want

11   to use deposition testimony, have somebody here to read it.

12   You make objections as you go along.  It's just as if the

13   witness was here.  If it's video -- is it a video deposition?

14         *MR. BAILEY:*  No, your Honor.

15         *THE COURT:*  It's transcripts.

16         *MR. BAILEY:*  It's transcripts.

17         *THE COURT:*  So you don't need to make any designations

18   ahead of time.

19         *MR. BAILEY:*  We have nothing further, your Honor.

20         *THE COURT:*  Okay.  Anything -- any other questions

21   about the trial process you want to know about?

22         *MR. BAILEY:*  Not at this time.

23         *MR. PLANEGGER:*  None, your Honor.

24         *THE COURT:*  We seat 12 people for the jury.  I

25   encourage to you make an appointment with Ms. Glover for

1    training on the equipment.  And in particular part, you're

2    going to want to look at the ELMO.  Are you planning on using a

3    computer display mechanism?

4        *MR. WEAVER:*  No, your Honor.  At this time we were

5    thinking about using the overhead.

6        *THE COURT:*  Okay.  The ELMO.  Well, okay.  What I

7    would suggest you do when you take that training is have

8    somebody sit in the jury box.  You can see the size of the

9    screens.  They're not very big.  In fact, they're smaller than

10   my laptop screen up here.  And I suggest you put down on the

11   ELMO a piece of paper and see how it shows up on those screens.

12   Although this was state of the art as far as technology when

13   this building was built in 2002, as we all know technology has

14   advanced a great deal since then.

15       And the complaint that we frequently have from jurors

16   is that if you ask them to read documents on the screen, it's

17   very hard for them to do that if it's displayed on the ELMO.

18   So you may want to think about and practice how to blow things

19   up on the ELMO or how to segregate portions of documents that

20   you think are important for the jury to see.

21       With regard for *voir dire*, I'll conduct the *voir dire*.

22   You can submit questions for *voir dire*.  And if you'd like to

23   submit this at the same time you do your revised final pretrial

24   order -- or proposed final pretrial order, you can do that.

25       Similarly, you're going to need to submit jury

1    instructions.  Do you want to submit those instructions at the

2    same time, or do you want another deadline?

3         *MR. WEAVER:*  Your Honor, if we could have a little bit

4    more time so that we could work on those instructions that can

5    be stipulated to.

6         *THE COURT:*  Okay.  When do you want to want to have

7    them ready?

8         *MR. WEAVER:*  Your Honor, in view of an October trial,

9    would sometime in May be reasonable?

10        *THE COURT:*  Whatever you'd like.

11        *MR. PLANEGGER:*  That would be fine.

12        *THE COURT:*  Okay.  So May 31?  Is that a date that

13   things can be filed?

14        *THE COURTROOM DEPUTY:*  No.  It's a Sunday.

15        *THE COURT:*  Okay.  So why don't we just say June 1.

16   Submit your jury instructions.  Please do not submit stock jury

17   instructions.  You'll be able to pull those off the web.  You

18   need case-specific jury instructions, a jury instruction that

19   has all your stipulated facts in it, and a jury instruction

20   that has a statement of the case in it.

21        *MR. WEAVER:*  Your Honor, should we also submit, if we

22   can agree -- or if we can't agree, for that matter, a jury

23   verdict form?

24        *THE COURT:*  No.

25        *MR. WEAVER:*  Okay.

1          THE COURT:   The way we do this in this courtroom is

2    your jury instructions are suggestions.   We will put together a

3    packet of conclusory jury instructions.   There is an initial

4    set of jury instructions.   Those are available for you to

5    review on the web as well.   They're given to the jury before

6    your opening statements.   The conclusory jury instructions are

7    included in a packet which you get usually the second day of

8    trial.

9          When we go to the charging conference, we will be

10   working from that packet.   When you get your packet, you'll get

11   a verdict form.   We customarily use, although you're free to

12   object if you like, a special verdict form with interrogatories

13   that track the elements of the claim.   And that verdict form

14   will be given to you in a proposed format along with the

15   packet.

16         At the charging conference, you'll make your

17   objections to the packet and to the proposed verdict form.   If

18   you have additional instructions or different instructions, you

19   tender them in paper to Ms. Glover.   They're marked as

20   exhibits, just like the packet.   They become exhibits to the

21   charging conference hearing.   As a consequence, then, if there

22   is an appeal, the court of appeals can see the entire packet

23   and everything you tendered as well as the transcript in order

24   to have a complete record of that charging conference.

25         What you have submitted in June is water under the

1    bridge at that point.  We won't be going back to those jury

2    instructions unless, of course, you tender them again as

3    exhibits for the charging conference.

4         MR. WEAVER:  Yes, your Honor.

5         THE COURT:  Everybody understand what that's going to

6    look like?

7         MR. PLANEGGER:  Understood, your Honor.

8         THE COURT:  Your opening statements are statements,

9    not arguments.  You're free to make them as long or as short as

10   you like.  Same is true with the closing argument.  You're free

11   to make that as long or as short as you like.

12        With regard to examination of witnesses, direct

13   examination, cross-examination, and redirect, there is no

14   recross, unless there is a new area is opened on the redirect.

15        If you want to consolidate the testimony of a witness

16   that would be called both -- for both parties, the way you do

17   it is you can agree to do it.  There is no problem with that.

18   You just simply call that witness.  The party who calls them --

19   it's usually the plaintiff in that case -- engages in direct

20   examination.  When the defendant engages in cross-examination

21   and wants to switch to direct examination, you note it for the

22   record.  That way, when the redirect examination by the

23   plaintiff ensues and you want to switch to cross-examination,

24   you can note it for the record as well and we'll have a

25   delineated scope of both direct and cross for both parties.

1          Any questions about that procedure?

2          MR. WEAVER:  No, your Honor.

3          MR. PLANEGGER:  No, your Honor.

4          THE COURT:  In selection of the jury, after I engage

5    in voir dire, I'll invite you to the bench in case there are

6    any other questions you want to have asked of particular

7    members of the panel or of the panel as a whole.  You'll have

8    an opportunity to make challenges for cause.  Once the entire

9    panel is passed for cause, then we move to peremptory

10   challenges.  We use a strike sheet; and if you want that

11   information as to the jury selection process, Ms. Glover has it

12   in a written format so that you can see how that works.

13          There are a couple of issues for you all to consider,

14   and we'll ask you, if you aren't prepared to advise the Court

15   today -- we'll ask you on the day of trial.  The first is

16   during the peremptory challenge exercise with the strike sheet.

17   Sometimes it can be a bit oppressive for counsel, as the jury

18   is staring you down while you're making your selections.  And

19   so I offer during that time period to provide historical

20   background for the jury on the courthouse and the District of

21   Colorado in order to shift their focus off of you.  If you'd

22   like me to do that, I'm happy to do that; and if you're

23   concerned about what I might say to the jury, Ms. Glover also

24   has that information in writing so you can review it ahead of

25   time.

 1          The second decision that you will need to make is

 2   whether or not you want feedback back from the jury.  I

 3   customarily meet with the jury after every trial and provide

 4   them with an opportunity to give written feedback in a

 5   questionnaire format.

 6          In the jury book and the jury comment book that

 7   Ms. Glover has -- it's become affectionately referred to as the

 8   "Little Black Book," only it's pretty big now -- you can read

 9   the comments of jurors in prior trials.  You won't be able to

10   tell probably what kind of trial it was, because these include

11   both civil and criminal trials; but the comments are on two

12   different forms.  The first form is the form that I solicit

13   from the jury so I have information to put in the notebook and

14   also to advise us on how we can better deal with juries.  The

15   second form is a form that you can use.  If you would like to

16   me, I will give it to the jury; and it gives them the

17   opportunity either individually or collectively, either

18   anonymously or by designation of the person responding, to

19   provide feedback to you.  And that's something that if you

20   agree to, I'll be happy to give to them.  They take those home,

21   mail them back to the courthouse after the appeal period

22   passes; I forward them on to you.

23          Ms. Glover has a list of materials she can make

24   available to you.  They include a number of evidentiary cheat

25   sheets that have been developed by the Federal Faculty or we've

1   developed because there are common tricky areas with regard to

2   evidentiary issues.

3         Ms. Glover, what else is in that packet?

4         *THE COURTROOM DEPUTY:*  I have a sheet that I'm going

5   to give them.  It is courtroom FAQs, material on impeachment,

6   refresh recollection, Faculty of Federal Advocates material on

7   admission of electronic evidence, same from the Colorado

8   Women's Bar, an order regarding 702 testimony from this court

9   and opinion, historical information, the written comments form,

10   and the opportunity to come train and to look at the black

11   book.

12         *THE COURT:*  She can send all of this to you

13   electronically, if you like.

14         *MR. WEAVER:*  We would like that, your Honor.

15         *THE COURT:*  Okay.

16         *MR. PLANEGGER:*  We would, too, your Honor, thank you.

17         *THE COURTROOM DEPUTY:*  Just leave me your e-mails

18   before you go.

19         *THE COURT:*  Let me ask you:  Are you interested in

20   having the historical information during the *voir dire* process

21   provided to the jury?

22         *MR. BAILEY:*  I think that would be fine, your Honor.

23         *MR. PLANEGGER:*  I think it would be great.

24         *THE COURT:*  Okay.  Would you make note of that,

25   Ms. Glover.

1         And also do you want to take advantage of feedback

2 from the jury?

3         *MR. BAILEY:*  Absolutely.

4         *MR. PLANEGGER:*  Definitely, your Honor.

5         *THE COURT:*  Okay.  Then let's do that.

6         *THE COURTROOM DEPUTY:*  Okay.

7         *THE COURT:*  Any objection to the jury taking notes?

8         *MR. WEAVER:*  No objection, your Honor.

9         *MR. PLANEGGER:*  No objection, your Honor.

10         *THE COURT:*  Any other questions about the trial

11 process that I can answer so that you'll feel comfortable and

12 prepared?

13         *MR. BAILEY:*  We have none, your Honor.  Thank you.

14         *MR. PLANEGGER:*  No further questions.

15         *THE COURT:*  Thank you.

16         Then let me speak for a moment to the parties.  And

17 this is the part of the final pretrial process that is most

18 important for Mr. Ward and, I hope, Counsel, you will pass it

19 on to -- well, actually I misspoke.  This is the part that is

20 most important for Mr. Maskell, and I'll ask Counsel to pass it

21 on to him.

22         I know that parties come into trial with great

23 expectations as to what they think the trial process is about,

24 and counsel do their very best to explain what the trial

25 process is about and what it can accomplish and what it can't

1    accomplish.  But in my experience, it's helpful for litigants

2    to hear that from the person who is going to be presiding over

3    the trial.

4         The most important thing for the parties to remember

5    is this is their action, not my action, not even the attorneys'

6    action; and therefore, they have decisions to make between now

7    and the time of trial as to whether or not they want to

8    proceed.  And in making an informed decision with regard to

9    that, it's important to know what's going to happen here in the

10   courtroom.

11        I don't care who wins or loses.  And, in fact, I can't

12   care.  It's not appropriate for me to do that.  Both sides

13   deserve an absolutely neutral judge.  And should I begin to

14   care, I will recuse.  My job is to make sure that the process

15   here is fair and impartial.  And that means that the Rules of

16   Evidence will apply and the Rules of Civil Procedure will

17   apply; and that's not because any of us particularly like them

18   in part or *in toto*; but they are the rules, and that's what

19   assures that we have a level playing field.

20        Now, the trial process has some drawbacks.  First and

21   foremost, people think it results in a final decision.  And

22   once this trial is over, everything is conclusively resolved.

23   Not so in many cases, and that's because the unhappy party

24   wants to appeal and the process of appeal often takes a long

25   time.

1    In this courtroom, post-trial motions move to a back

2    burner because we've got pretrial motions in other cases; and

3    right now, as you know, in this court we all are short-staffed

4    because we're down two judges.  And that means that we're

5    carrying in excess of 300 civil cases and in excess of 100

6    criminal cases each.  So post-trial motions will be decided

7    later than will pretrial motions in other cases.

8    There is some delay at this level.  And once the

9    post-trial motions are determined, then the appeal would go to

10   the Tenth Circuit Court of Appeals, I believe, even in this

11   case.  That being the case, it is not uncommon for an appeal to

12   take a year or more at the Tenth Circuit.

13   Assuming I made an error and the case is reversed

14   because of my error, it will be remanded and we'll get the

15   pleasure of doing it all over again.  That means that the

16   decision in this case as a result of trial may not be final.

17   The second drawback in civil litigation is that the

18   jury that we're going to select here, 12 people from the

19   community, will know nothing about this case, they may know

20   nothing about tax law, they may know nothing about this kind of

21   business, they may not know anything about how businesses are

22   organized.  And their obligation is to be fair and impartial,

23   too.

24   The only way that they can determine what happened --

25   and that's their job, is to determine what happened as to the

1    facts that the parties can't agree on and apply the law to

2    those facts and the stipulated facts -- is to listen to the

3    witnesses and look at the exhibits.

4         Now we all know that when we were children we played

5    that game of Telephone or Gossip, whatever it was that you

6    called it when you were young.  And that's where one person

7    whispers into another's ear and the message passes on down the

8    line.  And the message at the end of the line is always

9    different than the message which was originally given.  And the

10   psychologists, of course, tell us the reason is what we

11   perceive, how we process, and how we articulate is different

12   for every single person.

13        What that means is that witnesses who are sitting here

14   on the stand testifying, even if they do their very best job to

15   testify truthfully, may have perceived, processed, recalled, or

16   articulate things differently.  And the jurors have to rely on

17   what is reported here at the witness stand in order to

18   determine what happened.  That's a little bit like inviting

19   them over to your house after you get back from your tropical

20   vacation, show them the pictures of the beach and the trees,

21   and expect them to smell the salt air and taste the margarita.

22   They can't really do that well because they weren't there.

23        They do their very best, but they're limited to the

24   information that's presented here in the courtroom.

25        In addition, there is the time and the expense and the

1   wear and tear that comes with participation in a trial.  And at

2   this juncture, if we had Mr. Maskell here, I would undoubtedly

3   tell him that we, the attorneys and the court staff, are

4   probably the only folks who like being in a courtroom.  The

5   jurors generally don't when they first come in, and the parties

6   never, like being in the courtroom because it's a foreign

7   experience.  And it reminds me of those commercials that you

8   see on TV -- I think they're Mastercard commercials -- where

9   there is some particular event or celebration for which

10  Mastercard can pay for all of the accoutrements.  But at the

11  end, there is a comment about something being priceless.  Well,

12  the truth of the matter is when we say something is priceless,

13  we say we cannot measure its value in money; and there is no

14  way to measure the stress or the strain or the wear or the tear

15  in the courtroom in terms of money.  There is no way to measure

16  the lost sleep, the inability to eat breakfast, the nervousness

17  in watching the evidence come in, the discomfort in sitting on

18  the witness stand.  Those are all factors that affect you when

19  you're in the courtroom, and there is no way to calculate that

20  in terms of money.

21         Loss of productivity is also something that both

22  Government employees and private litigants suffer from when

23  they come to court.  They have to divert their energy toward

24  this particular controversy as compared to all the other things

25  that they need to deal with; and there is no way to compensate

1    that.

2         So the bottom line is that although we believe that

3    the trial process is the best way to resolve disputes that

4    people can't otherwise resolve and it's much better than the

5    alternative of shoot 'em up in the Okay Corral, it does have

6    its drawbacks.

7         The option that the attorneys and the parties have to

8    consider to trial is to try to resolve the controversy by

9    settlement.  That offers a number of benefits that can't be

10   accomplished in the trial.  It's final.  It doesn't have the

11   wear and tear.  It doesn't have the imperfection of listening

12   to testimony by witnesses and looking at exhibits, particularly

13   here documents that may be government forms that are unfamiliar

14   to the jury.  And it may have the benefit for Mr. Maskell,

15   given his financial circumstances, of providing some kind of

16   compromise that addresses those circumstances, either a reduced

17   amount or a long-term payout.

18        I mention this because I have never in 15 years on the

19   bench seen a settlement that wasn't better than what we can

20   accomplish in the courtroom, even though we do our very best

21   job here.  And I want the parties to consciously and with great

22   consideration evaluate the opportunities to settle as compared

23   to the trial process to resolve their differences.

24        Now, I know you've had a settlement conference with

25   Magistrate Judge Tafoya.  Is there any benefit in scheduling

1   another one?

2          MR. BAILEY:  I don't think so honestly, your Honor.

3          MR. PLANEGGER:  I don't think at this time, your

4   Honor.  We did briefly discuss settlement based on

5   Mr. Maskell's financial constraints, and I've provided counsel

6   with a draft financial statement that reflects his current

7   situation.  And I hope to get that finalized with some

8   documentation very shortly, so --

9          THE COURT:  I'm not going to force you to another

10  settlement conference.  If you think it's going to be

11  beneficial, I urge you to contact Magistrate Judge Tafoya.

12  We've got a long time till trial here; and if you think that's

13  going to be helpful, I would urge you to do that.  If you

14  choose not to, you choose not to.

15          But I will expect that Mr. Maskell will have the

16  opportunity to review the transcript of this proceeding and

17  hopefully have a conversation with Counsel as to the comments

18  that I've made about the trial process.

19          If the matter goes to trial, I'll look forward to

20  seeing you in October.  Again, I apologize that it's so far

21  away.

22          Is there anything else we can do today?

23          MR. BAILEY:  I don't think so, your Honor.  Thank you

24  for your time this morning.

25          MR. PLANEGGER:  Thank you, your Honor.

1          MR. WEAVER:  Thank you, your Honor.

2          MR. WARD:  Thank you, your Honor.

3          THE COURT:  Thank you all, Counsel; and I will look

4    forward to either finding out that you've resolved this dispute

5    or seeing you in October.

6          We'll stand in recess.

7       (Recess at 11:13 a.m.)

8                        *   *   *   *   *

9                    **REPORTER'S CERTIFICATE**

10      I certify that the foregoing is a correct transcript from

11   the record of proceedings in the above-entitled matter.  Dated

12   at Denver, Colorado, this 27th day of February, 2009.


14                                    *S/Paul A. Zuckerman*
                                      Paul A. Zuckerman

15

16

17

18

19

20

21

22

23

24

25